**Luis Alberto Galvis MUJICA,
et al. Plaintiffs,**

v.

**OCCIDENTAL PETROLEUM CORP.,
et al. Defendants.**

No. 03–2860 WJR(JWJX).

United States District Court,
C.D. California.

June 28, 2005.

Bridget Arimond, Douglass W. Cassel, Center for International Human Rights Northwestern University Law School, Chicago, IL, Daniel M. Kovalik, United Steelworkers of America, Pittsburgh, PA, Derek J. Baxter, Jeffrey Vogt, Terry Collingsworth, International Labor Rights Fund, Washington, DC, Paul L. Hoffman, Schonbrun DeSimone Seplow Harris and Hoffman, Venice, CA, for Plaintiffs.

Daniel P. Collins, Daniel Luke Geyser, John W. Spiegel, Manuel F. Cachan, Munger Tolles & Olson, Los Angeles, CA, Kristin Linsley Myles, Munger Tolles & Olson, San Francisco, CA, Kenneth J. Berke, Berke & Kent, Calabasas, CA, Sara M. Fotopulos, Thomas E. Fotopulos, Fotopulos & Fotopulos, Riverview, FL, for Defendants.

ORDER DENYING, IN PART, AND GRANTING, IN PART, DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)

REA, District Judge.

The matter came on for hearing before the Court, the Honorable William J. Rea, Judge, presiding, on January 10, 2005. Having considered the motion, the papers

filed in support thereof and in opposition thereto, the oral argument of counsel, and the file in the case, the Court now makes the following decision: the Court hereby DENIES, in part, and GRANTS, in part, Defendant Occidental Petroleum Corp.'s Motion to Dismiss Plaintiffs' First Amended Complaint Pursuant to Fed.R.Civ.P. 12(b)(6).[1]

While portions of Plaintiffs' case are dismissed on other grounds, the Court dismisses the entire case pursuant to the political question doctrine.

## BACKGROUND

### I. Factual Allegations

The instant case arises from a bombing that occurred in Santo Domingo, Colombia on December 13, 1998. In 1998, Plaintiffs lived in Santo Domingo. The Defendants, Occidental Petroleum Corp. ("Occidental") and AirScan, Inc., are both American companies; the former is located in Los Angeles, the latter in Florida. Defendant Occidental operates, as a joint venture with the Colombian government, an oil production facility and pipeline in the area of Santo Domingo.

Plaintiffs allege the following relevant facts. Since 1997, Defendant AirScan has provided security for Defendant Occidental's oil pipeline against attacks from left-wing insurgents. *See* First Amended Complaint ("FAC") at ¶ 15. Prior to 1998, Defendants worked with the Colombian military, providing them with financial and other assistance, for the purpose of furthering Defendant Occidental's commercial interests. *See id.* at ¶ 16. On several occasions during 1998, Defendant Occidental provided Defendant AirScan and the Colombian military with a room in its facilities to plan the Santo Domingo raid. *See id.* at ¶ 19. Defendant AirScan and the Colombian Air Force ("CAF") carried out this raid for the purpose of providing security for Defendant Occidental (i.e., protecting its oil pipeline) and was not acting on behalf of the Colombian government. *See id.* During the raid, three of Defendant AirScan's employees, along with a CAF liaison, piloted a plane with CAF markings and that was paid for by Defendant Occidental. *See id.* From this airplane, Defendant AirScan provided aerial surveillance for the CAF, helping the CAF identify targets and choose places to deploy troops. *See id.* at ¶ 3.

On December 13, 1998, residents of Santo Domingo saw low-flying CAF helicopters overhead and attempted to communicate that they were civilians by lying down on the road and covering their heads with white shirts. *See id.* at ¶¶ 19–20. Soon thereafter, several witnesses saw an object (or several objects) drop from one of the CAF helicopters. *See id.* One of the cluster bombs dropped by the CAF exploded directly in the town of Santo Domingo, destroying homes and killing seventeen civilians and wounding twenty-five others. *See id.* at ¶ 21. Of the seventeen killed, six were children. *See id.* During the attack, the CAF helicopters knowingly fired on civilians attempting to escape and on those who were trying to carry the injured to a medical facility. *See id.* at ¶ 24. Soon thereafter, other CAF troops entered the town, blocked civilians from leaving, and ransacked their homes. *See id.*

While the purpose of the Santo Domingo raid was to protect Defendant Occidental's pipeline from attack by left-wing insurgents, no insurgents were killed in the attack. *See id.* at ¶ 25. These insurgents were located at least one to two kilometers outside of the Santo Domingo. *See id.* Defendants knew that the insurgents were

---

1. Defendant AirScan, Inc. has joined this motion.

not in Santo Domingo but carried out the attack nonetheless. *See id.*

Plaintiff Luis Alberto Galvis was approximately 800 to 1000 meters outside of Santo Domingo during the raid. *See id.* at ¶ 27. After he saw a CAF helicopter and heard an explosion, he attempted to return to Santo Domingo. *See id.* Before he could enter, a CAF helicopter fired upon him and prevented him from returning. *See id.* The next day, Plaintiff Luis Alberto Galvis learned that his mother, Teresa Mujica Hernandez, his sister, Edilma Leal Pacheco, and his cousin, Johanny Hernandez Becerra, had been killed during the raid. *See id.* at ¶¶ 22, 28.

Plaintiff Mario Galvis, Luis Alberto Galvis' father, was also in Santo Domingo at the time of the bombing and was injured during the raid. *See id.* at ¶ 23. Bomb shrapnel tore through his chest, breaking both of his collar bones. *See id.* He was subsequently hospitalized and continues to suffer chronic pain from these injuries. *See id.* During the raid, he also saw his wife, Teresa Mujica Hernandez, and daughter, Edilma Leal Pacheco, killed as a result of Defendants' actions. *See id.*

Plaintiff John Mario Galvis, Luis Alberto Galvis' younger brother and Mario Galvis' son, was in Santo Domingo at the time of the bombing. *See id.* During the raid, he saw his mother, Teresa Mujica Hernandez, and sister, Edilma Leal Pacheco, killed as a result of Defendants' actions. *See id.*

Plaintiffs have made other allegations regarding the events that took place after the bombing. The Court will refer to those allegations as necessary in the course of its opinion.

## II. Procedural History

On April 24, 2003, Plaintiff Luis Alberto Galvis Mujica filed a Complaint, on behalf of himself and Teresa Mujica Hernandez, Edilma Leal Pacheco, and Johanny Hernandez Becerra. On October 6, 2003, Plaintiffs filed their FAC, adding Plaintiffs Mario Galvis Gelvez and John Mario Galvis Mujica. In their FAC, Plaintiffs have brought federal claims under the Alien Tort Statute, 28 U.S.C. § 1350, and the Torture Victim Protection Act, 28 U.S.C. § 1350 Note, as well as state law claims of wrongful death, intentional infliction of emotional distress, negligent infliction of emotional distress, and violations of Cal. Bus. & Prof.Code § 17200.

On January 20, 2004, the Court GRANTED Defendant Occidental's Motion requesting that the Court solicit the views of the United States Department of State regarding potential foreign policy implications raised by this action. On April 2, 2004, the Department of State filed a Statement of Interest indicating that it did not yet have a position on the foreign policy implications of this case. On July 22, 2004, the parties stipulated to an extended briefing schedule regarding Defendant Occidental's motions to dismiss. This briefing schedule was extended so that the parties could incorporate the Supreme Court's June 29, 2004 decision in *Sosa v. Alvarez–Machain,* 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). The parties completed their briefing on December 20, 2004.

On December 30, 2004, the State Department filed a Supplemental Statement of Interest indicating that it now opposes the pursuit of the instant litigation since it would severely impact this country's diplomatic relationship with Colombia. As part of that Supplemental Statement of Interest, the State Department attached a letter from the Colombian government indicating that it also opposed this litigation.

On January 20, 2004, the Court heard oral argument on Defendant's motions. During that oral argument, the parties requested the opportunity to file additional briefs addressing the Supplemental State-

ment of Interest. That supplemental briefing was completed on February 16, 2005. Since February, the parties have continued to file supplemental declarations and supplemental authority with the Court.

## DISCUSSION

### I. Legal standards

Pursuant to Rule 12(b)(6), a party may bring a motion to dismiss a plaintiff's claims on the ground that the allegations "fail to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Generally, "[a] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Dismissal is proper if there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.1988).

In reviewing a Rule 12(b)(6) motion, the court must "take as true" all material facts in the complaint. *Hospital Bldg. Co. v. Trustees of the Rex Hospital*, 425 U.S. 738, 740, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). The "complaint is to be liberally construed in favor of plaintiff." *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). The court may consider any material that is properly attached to the complaint as part of the pleadings to be reviewed. *See Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.*, 583 F.2d 426, 429–30 (9th Cir.1978).

██ Lastly, a court should grant leave to amend even if the plaintiff does not request it, unless the court "determines that the pleading could not possibly be cured by the allegation of other facts." *Doe v. United States*, 58 F.3d 494, 497 (9th Cir.1995).

### A. Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 Note

Section Two of the TVPA establishes liability for:

(a) Any individual who, under actual or apparent authority, or color of law, of any foreign nation-

(1) subjects an individual to torture . . .; or

(2) subjects an individual to extrajudicial killing . . . .

Section 2(b) of the TVPA requires plaintiffs to exhaust "adequate and available remedies in the place in which the conduct giving rise to the claim occurred."

Section 3(a) of the TVPA defines extrajudicial killing:

. . . the term "extrajudicial killing" means a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

Section 3(b) of the TVPA defines torture:

(1) the term "torture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering . . ., whether physical or mental, is intentionally inflicted on that individual . . .

### B. Alien Tort Statute ("ATS"), 28 U.S.C. § 1350

This statute provides, in its entirety, that:

The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

## C. Foreign affairs doctrine

■ The foreign affairs doctrine provides that state laws may not intrude "into the field of foreign affairs which the Constitution entrusts to the President and the Congress." *Zschernig v. Miller*, 389 U.S. 429, 432, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968). The doctrine holds that "even in the absence of a treaty", state laws must yield where "a State's policy may disturb foreign relations." *Id.* at 441, 88 S.Ct. 664.

"[T]he Supreme Court has long viewed the foreign affairs powers specified in the text of the Constitution as reflections of a generally applicable constitutional principle that power over foreign affairs is reserved to the federal government." *Deutsch v. Turner Corp.*, 317 F.3d 1005, 1020 (9th Cir.2003).

## D. Act of state doctrine

■ "The act of state doctrine in its traditional formulation precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). "The text of the Constitution does not require the act of state doctrine; it does not irrevocably remove from the judiciary the capacity to review the validity of foreign acts of state." *Id.* at 423, 84 S.Ct. 923.

■ "The act of state doctrine is not a jurisdictional limit on courts, but rather 'a prudential doctrine designed to avoid judicial action in sensitive areas.'" *Liu v. Republic of China*, 892 F.2d 1419, 1431 (9th Cir.1989) (quoting *Int'l Ass'n of Machinists & Aerospace Workers v. OPEC*, 649 F.2d 1354, 1359 (9th Cir.1981)).

## E. Political question doctrine

■ "The nonjusticiability of a political question is primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 211, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

"Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the case to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Id.* at 217, 82 S.Ct. 691.

## II. Application to the Instant Case

### A. Torture Victim Protection Act (TVPA)

Defendant argues that Plaintiffs' TVPA claims fail on several grounds: (1) Plaintiffs have failed to exhaust available remedies, *see* Motion at 3; (2) the TVPA does not recognize aiding and abetting liability, *see id.* at 4; (3) Defendant did not act under "color of law", *see id.* at 4–5; (4) corporations are not "individuals" liable under the TVPA, *see id.* at 5–6; (5) Plaintiffs did not adequately plead claims of "torture" or "extrajudicial killing", *see id.* at 6–9.[2]

---

**2.** As the Court principally dismisses Plaintiffs' TVPA claims on the basis that corporations are not liable under the statute, the Court declines to address Defendant's arguments that Plaintiffs have failed to exhaust administrative remedies or have inadequately pled claims for extrajudicial killing and torture.

### 1. The TVPA does not recognize aiding and abetting liability

Relying on *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), Defendant argues that the TVPA should not be "construed to authorize aiding and abetting liability." *See* Motion at 4. Plaintiffs argue that they have not alleged that Defendants are liable because they aided or abetted but because they were joint tortfeasors. *See* Opposition at 2–3.

### a. Plaintiffs have not pled an aiding and abetting liability theory of recovery

The Court holds that Plaintiffs are not asserting that Defendant Occidental was aiding or abetting the actions of the Colombian military. At numerous points in their FAC, they allege that the Colombian Air Force ("CAF") was working in concert with Occidental. "The CAF receives direct funding from Defendant Occidental Petroleum Corporation ("Occidental") in return for protecting Occidental's pipeline in Cano Limon and was acting in the furtherance of the private interests of Occidental in carrying out this bombing." FAC at ¶ 2. "Plaintiffs bring this action against Defendants Occidental and AirScan because these Defendants were *involved in a conspiracy with the CAF* to carry out these unlawful attacks and because these Defendants provided practical support and encouragement to the CAF in carrying out this massacre." *Id.* at ¶ 4 (emphasis added). "At all relevant times, Occidental, AirScan and the CAF were *joint venturers and co-conspirators* and were working in concert with each other and acting within the course and scope of such joint venture

and conspiracy." *Id.* at ¶ 39 (emphasis added). "Specifically, as is alleged above, Defendants, operating under color or law, *conspired and acted jointly with the CAF* officers to carry out a bombing raid upon the town of Santo Domingo ...." *Id.* at ¶ 44 (emphasis added).

█ While Defendant clearly believes that Plaintiffs have not yet supplied enough facts to support this theory, *see* Reply at 4, the Court is not prepared to hold that Plaintiffs cannot prove *any* set of facts in support of their claim which would entitle them to relief. *See Conley*, 355 U.S. at 45–46, 78 S.Ct. 99. Evaluating whether Plaintiffs' have supplied enough facts to succeed on their claims is more appropriate in a motion for summary judgment.[3]

### b. Whether the TVPA provides for aiding and abetting liability

█ Even if Plaintiffs had pled aiding and abetting liability, the Court holds that *Central Bank* does not indicate that aiding and abetting liability is unavailable under the TVPA. Initially, the Court notes that *Central Bank* can be distinguished since the cause of action considered in that case was an implied right of action. *See Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1019 (7th Cir.2002) (commenting that "the courts were already inferring an intent by Congress to create a private civil cause of action with section 10(b), and they would have been stacking another inference on top of that one in extending liability to aiders and abettors"). Here, the TVPA provides an express right of action.

*Central Bank* stands for the proposition that "when Congress enacts a statute under which a person may sue and recover

---

**3.** Defendant has not directly challenged whether joint and several liability theories are available under the TVPA. However, the Court has no reason to think that it is unavailable. *See Doe I v. Unocal Corp.*, 395 F.3d 932, 970 (9th Cir.2002) (Reinhardt, J., concurring) ("It is well-established as a federal common law principle that a member of a joint venture is liable for the acts of a co-venturer.").

damages from a private defendant for the defendant's violation of some statutory norm, *there is no general presumption* that the plaintiff may also sue for aiders and abettors." 511 U.S. at 182, 114 S.Ct. 1439 (emphasis added). However, this proposition is different than a rule which *precludes* aiding and abetting liability *unless expressly provided* for via the language of the statute.

In *Central Bank*, the question before the Court was whether section 10(b) of the Securities Exchange Act of 1934 extends civil liability to those who "aid and abet" the violation. *Id.* at 167, 114 S.Ct. 1439. The Court's analysis began with the text of the statute. *Id.* at 173, 114 S.Ct. 1439. After recognizing that the language of the statute did not include the words "aid" or "abet", the Court held that the words "directly or indirectly" in section 10(b) circumscribe the liability of the statute to preclude aiding or abetting liability. *Id.* at 175–76, 114 S.Ct. 1439. In other words, since the statute described liability as extending to those who "directly or indirectly" committed securities fraud, aiding and abetting (as liability that does not require even indirect action) was not prohibited by the statute.

Like section 10(b), the TVPA does not contain the words "aid" or "abet". However, unlike section 10(b), the TVPA states that an individual shall be held liable if that person "subjects" an individual to tor-

ture or extrajudicial killing. *See* § 1350 Note § 2(a). To "subject" is defined as "to cause to undergo or experience some action or treatment."[4] Webster's New World Dictionary 1334 (3d ed.1988).[5] Because an aider or abettor can be a "cause" of torture or extrajudicial killing by creating the conditions necessary for those unlawful acts to occur, this definition of "subjects" does not clearly answer whether an individual may be held liable as an aider or abettor. Thus, unlike the statute discussed in *Central Bank*, the plain language is rather inconclusive.

After looking at the language of section 10(b), the *Central Bank* Court next examined other private causes of action created by the Securities Acts of 1933 and 1934 and whether they provided for aiding and abetting liability. *Id.* at 178–80, 114 S.Ct. 1439. The Supreme Court found that none of the other express causes of action provided for aiding and abetting liability, thus indicating that there was no similar liability under § 10(b). *Id.* at 179–80, 114 S.Ct. 1439. The closest analogue to the TVPA is the ATS. *Cf. Papa v. United States*, 281 F.3d 1004, 1013 (9th Cir.2002) (finding that the statutes are sufficiently analogous so that the ATCA "borrows" the ten-year statute of limitations of the TVPA). The ATS provides for aiding and abetting liability. *See Doe I*, 395 F.3d at 947 n. 20 (noting that the ATCA provides for aiding and abetting liability).[6] Thus,

---

**4.** Black's Law Dictionary does not define this term.

**5.** The TVPA was enacted by Congress in 1992.

**6.** The parties dispute whether the ATS provides for aiding and abetting liability. *See* Opposition at 18–20; Reply at 16–17. The Ninth Circuit's decision in *Doe I* has arguably been altered by the Supreme Court's more recent decision in *Sosa* (although it is not clear that the Supreme Court intended to rollback the scope of the ATS as much as Defendant insists). However, the Court agrees with

Plaintiffs that the 1795 opinion of then-Attorney General William Bradford supports the conclusion that there is aiding and abetting liability under the ATS. As noted by Plaintiffs, the 1795 opinion was cited by *Sosa* with approval, *see* 124 S.Ct. at 2759. Unlike Defendant, *see* Reply at 16 n. 15, the Court interprets the opinion as discussing aiding and abetting liability. The last paragraph of the opinion contains Bradford's approval of the President's statement that any person "committing, aiding, or abetting" attacks on the British would be "liable for punishment under the laws of nations." *See* 1 U.S. Op. Atty.

unlike section 10(b), the most analogous private causes of action suggest that the TVPA provides for aiding and abetting liability.

In the next step of its analysis, the Supreme Court attempted to discern the intent of Congress with respect to the scope of liability. *Central Bank,* 511 U.S. at 181–85, 114 S.Ct. 1439. With respect to that statute, the Court found that "nothing in the text or history of § 10(b) even implies that aiding or abetting was covered" by the statute. *Id.* at 183, 114 S.Ct. 1439. Unlike § 10(b), the legislative history of the TVPA rather unequivocally states that the statute encompasses aiding and abetting theories of liability.[7] Under "Scope of liability", the Senate Judiciary Committee Report states that the "legislation is limited to lawsuits against persons who ordered, *abetted, or assisted* in the torture."[8] S.Rep. No. 102–249 at 8 (emphasis added). Thus, the legislative history with respect to the TVPA indicates that the statute provides for aiding and abetting liability.

For the above reasons, the Court holds that the TVPA does provide for aiding and abetting liability. Thus, the Court holds that Plaintiffs' TVPA claims should not be dismissed on this ground.

### 2. Defendant did not act under "color of law"

Defendant argues that Plaintiffs have insufficiently pled that "either of the private Defendants controlled [the] government action to the point where it could be deemed a 'state actor' in the sense contemplated by § 2(a)." *See* Motion at 4. Plaintiffs argue that they have sufficiently pled that Defendant controlled the CAF. *See* Opposition at 5.

■ "By its plain language, the Torture Victim [Protection] Act renders liable only those individuals who have committed torture or extrajudicial killing 'under actual or apparent authority, or color of law, of any foreign nation.'" *Kadic v. Karadzic,* 70 F.3d 232, 245 (2d Cir.1995). "In construing the terms 'actual or apparent authority' and 'color of law,' courts are instructed to look to principles of agency law and to jurisprudence under 42 U.S.C. § 1983, respectively." *Id.* (citing legislative history). "A private individual acts under color of law within the meaning of section 1983 when he acts together with state officials or with significant state aid." *Id.* (citing *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)). *See also Sable Com-*

Gen. 57, 59 (1795). This statement indicates that aiding or abetting liability was encompassed by the then-prevailing understanding of international law.

7. The Court notes that several courts have recognized aiding and abetting liability for TVPA claims. *See Doe v. Saravia,* 348 F.Supp.2d 1112, 1148–49 (E.D.Cal.2004); *Cabello Barrueto v. Fernandez Larios,* 205 F.Supp.2d 1325, 1332 (S.D.Fla.2002) (noting that the legislative history of the TVPA "makes clear" that the statute is intended to apply to those who ordered, abetted or assisted in the unlawful acts); *Mehinovic v. Vuckovic,* 198 F.Supp.2d 1322, 1355–56 (N.D.Ga. 2002); *Wiwa v. Royal Dutch Petroleum Co.,* 2002 WL 319887 at *16 (S.D.N.Y. Feb. 28, 2002) (finding that "the language and the

legislative history of the TVPA supports liability for aiders and abettors of torture and extrajudicial killing"); *but see In re South African Apartheid Litigation,* 346 F.Supp.2d 538, 555 (S.D.N.Y.2004) (*"In re Apartheid"*) (finding that "creating aider and abettor liability for private actors not acting under color of law would be inconsistent with the statute and precluded by *Central Bank"*).

8. While the committee report then goes on to discuss "command responsibility", the Court does not interpret the report to restrict liability to those situations. The Court believes the committee discussed "command responsibility" theories to distinguish them from situations where "an isolated act of torture occurred somewhere in that country." *Id.* at 8–9.

*munications of California Inc. v. Pacific Tel. & Tel. Co.,* 890 F.2d 184, 189 (9th Cir.1989) (discussing, for purposes of section 1983, that there is state action where there has been joint participation). *Cf. Bao Ge v. Li Peng,* 201 F.Supp.2d 14, 21–22 (D.D.C.2000) (commenting that the state action requirement of the ATS is met where there has been substantial cooperation between private corporations and the government).

■ The FAC alleges that the CAF was working closely with Defendant Occidental: in exchange for financial assistance, the CAF provided security. "Both AirScan and the military made the[ ] plans [to raid Santo Domingo] in the course of their security work for Defendant Occidental and were acting as agents of Defendant Occidental at the time." FAC at ¶ 18. "The CAF, in carrying out this raid, was acting in its role of providing security for Occidental and was not implementing official policy of the Colombian government." *Id.* at ¶ 19. "During all times relevant herein, Occidental has directly paid Air-Scan for its security services, or has channeled payment to AirScan through the Colombian Defense Ministry." *Id.* at ¶ 15. These allegations are sufficient to satisfy the "color of law" requirement of the TVPA.

Defendant's argument largely seeks to impose a higher factual sufficiency standard than is required by Rule 12(b)(6). *See* Reply at 7 ("Plaintiffs appear to suggest that the FAC does in fact allege the requisite control ... but the suggestion does not withstand scrutiny."). In a motion to dismiss, the Court only examines whether *any* set of facts in support of the claim could be proven.

### 3. Corporations are not "individuals" liable under the TVPA

Defendant argues that the term "individual", as used in the TVPA, "does not

encompass corporations." *See* Motion at 5. Plaintiffs argue that courts have previously interpreted the term, as used in this statute, to include corporations. *See* Opposition at 5–6.

A case cited by both parties, *Clinton v. City of New York,* 524 U.S. 417, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998), does not resolve this issue. For the purposes of the Line Item Veto Act, the Supreme Court held that the term "individuals" was to be construed as "synonymous" with the term "person." *Id.* at 428, 118 S.Ct. 2091. In making this holding, the Court observed that "in ordinary usage", both "individual" and "person" refer to "an individual human being". *Id.* at 428 n. 13, 118 S.Ct. 2091. The Court also observed that the term "person" "often has a broader meaning in the law." *Id.* (citing 1 U.S.C. § 1). Thus, even though *Clinton* did not so hold with respect to that specific statute, in general, "persons" includes corporations while "individuals" does not.

However, it is more practical for the Court to focus on cases that have examined the TVPA's use of the term "individual." In *Arndt v. UBS AG,* 342 F.Supp.2d 132, 141 (E.D.N.Y.2004), the court held that since "UBS AG is not an individual, but a corporation", it could not "be sued under the TVPA." *See* Reply at 8–9. In *Beanal v. Freeport–McMoRan, Inc.,* 969 F.Supp. 362, 382 (E.D.La.1997), the court held that "because Freeport as a corporation is not an 'individual' for purposes of the TVPA, Freeport cannot be held liable under the TVPA." *See* Motion at 6. However, both *Estate of Rodriquez v. Drummond Co., Inc.,* 256 F.Supp.2d 1250, 1266–67 (N.D.Ala.2003), and *Sinaltrainal v. Coca–Cola Co.,* 256 F.Supp.2d 1345, 1358–59 (S.D.Fla.2003), held that corporations are "individuals" for the purpose of the TVPA. *See* Opposition at 6.

The Court holds that corporations are not "individuals" under the TVPA based on its reading of the plain language of the statute.[9] *See Leocal v. Ashcroft*, 543 U.S. 1, 125 S.Ct. 377, 382, 160 L.Ed.2d 271 (2004) (stating that statutory interpretation "begins with the language of the statute"). The statute describes liability in terms of "an individual" who subjects another "individual" to torture or extrajudicial killing. *See* § 1350 Note § 2(a). The statute also defines torture as "any act, directed against an *individual* in the offender's custody or physical control" upon whom pain and suffering is inflicted. *See* § 3(b) (emphasis added). The Court does not believe it would be possible for corporations to be tortured or killed. The Court also does not believe it would be possible for corporations to feel pain and suffering. *See Leocal*, 125 S.Ct. at 382 ("When interpreting a statute, we must give words their 'ordinary or natural' meaning."). Thus, the only manner in which the statute does not reach an "absurd result", *see Clinton*, 524 U.S. at 429, 118 S.Ct. 2091, is by excluding corporations from the scope of the statute's liability.

During oral argument, Plaintiffs argued that the term "individual" does not have to be interpreted uniformly throughout the statute. This is incorrect. It is well-accepted that terms should be construed consistently throughout the statute. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003) ("Absent some congressional indication to the contrary, we decline to give the same term in the same Act a different meaning depending on whether the rights of the plaintiff or the defendant are at issue.");

*Atlantic Cleaners & Dyers v. United States*, 286 U.S. 427, 433, 52 S.Ct. 607, 76 L.Ed. 1204 (1932) ("Undoubtedly, there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning.").

Thus, the Court holds that the term "individual", for the purposes of this statute, does not include corporations. *See In re Agent Orange Product Liability Litigation*, 373 F.Supp.2d 7, 55–56 (E.D.N.Y. 2005) ("*In re Agent Orange*") (reaching the same conclusion after a similar analysis).

Since Defendant is a corporation, the Court GRANTS Defendant's Motion to Dismiss with respect to Plaintiffs' TVPA claims.

**B. Alien Tort Statute (ATS)**

In addition to their TVPA claims, Plaintiffs have brought claims under the ATS for extra-judicial killing, torture, crimes against humanity, cruel, inhuman and degrading treatment, and war crimes.

**1. Interpreting *Sosa***

Before examining Plaintiffs' ATS claims, the Court wishes to explain its understanding of the *Sosa* decision. The impact of the Supreme Court's recent decision is disputed by the parties. *See* Opposition at 10–14; Reply at 13–15.

In *Sosa*, 124 S.Ct. at 2754, the Supreme Court addressed whether the ATS "does no more than vest federal courts with jurisdiction." The Court's answer was:

> Although we agree the statute is in terms only jurisdictional, we think that at the time of enactment the jurisdiction

---

9. The Court did not find any pertinent legislative history in the Senate and House committee reports. Plaintiffs have found an isolated use of the word "persons" by Senator Specter, *see* Opposition at 5, but this does not overcome the Court's analysis of the plain language of the statute. In general, statements offered by individual members of Congress are not entitled to great weight. *See Sarei v. Rio Tinto PLC*, 221 F.Supp.2d 1116, 1134 n. 101 (C.D.Cal.2002).

enabled federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law.[10]

*Id.* In reaching this conclusion, the Court seems to have been persuaded by an amicus curiae brief filed by professors of federal jurisdiction and legal history. *Id.* at 2755. Those professors argued that "torts in violation of the law of nations would have been recognized within the common law of the time." *Id.* The Court believed that "history and practice give the edge" to that position. *Id.* "The sparse contemporaneous cases and legal materials referring to the ATS tend to confirm both inferences, that some, but few, torts in violation of the law of nations were understood to be within the common law." *Id.* at 2759.

 However, the Court did not restrict the causes of action provided by the ATS to those solely envisioned by the First Congress which enacted the statute. The Court found nothing in the "development in the two centuries from the enactment of § 1350 to the birth of the modern line of cases beginning with *Filartiga v. Pena–Irala,* 630 F.2d 876 (C.A.2 1980), has categorically precluded the federal courts from recognizing a claim under the law of nations as an element of common law . . . ." *Id.* at 2761. But the Court also indicated that federal courts should exercise caution in considering such causes of action.[11] *Id.* Thus, as this Court interprets *Sosa,* the following guideline limits the range of possible ATS claims:

Whatever the ultimate criteria for accepting a cause of action subject to jurisdiction under § 1350, we are persuaded that federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations that the historical paradigms familiar when § 1350 was enacted.

*Id.* at 2765. Further, "the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." *Id.* at 2766.

This Court also notes that other language in the *Sosa* opinion contemplates, but does not definitively impose, other limitations on ATS claims. In footnote 21 of the opinion, the Supreme Court considered an exhaustion requirement similar to the TVPA and indicated that it "would certainly consider this requirement in an appropriate case." *Id.* at 2766 n. 21. The Court also considered "a policy of case-specific deference to the political branches." *Id.* While the Court merely referred to this as a "possible limitation", the Court remarked that, where the U.S. State Department has weighed in, "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy." *Id.*

From this understanding of *Sosa,* the Court now turns to Plaintiffs' claims.[12]

---

10. *See also id.* at 2761 ("The jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time.").

11. *See id.* at 2762–63 (providing reasons for such caution).

12. Plaintiffs have provided a very different reading of the Supreme Court's decision in *Sosa. See* Opposition at 10–14. Plaintiffs interpret that decision as leaving the current body of ATS case law as entirely unaltered so that any plaintiffs can pursue ATS claims for violations of international law norms that are "specific, universal, and obligatory." *See id.* at 10. Plaintiffs also argue that once a plaintiff has pled such an ATS claim, the courts *do*

**2. Whether Plaintiffs' claims are "for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted"**

Defendant first argues that the international law norms claimed by Plaintiffs are insufficiently supported by treaties that are not self-executing. *See* Motion at 12–13. Plaintiffs seem to agree to some extent. *See* Opposition at 15 n. 16. The Court holds that treaties that fail to "impose obligations" because they are "not self-executing" do not "themselves establish the relevant and applicable rule of international law." *Sosa*, 124 S.Ct. at 2767. However, like the respondent in *Sosa*, Plaintiffs may show that the norms that are the basis of the ATS claim have "attained the status of binding customary international law." *See id. See also In re*

*Estate of Ferdinand E. Marcos Human Rights Litigation* ("*Estate I* "), 978 F.2d 493, 502 (9th Cir.1992) (stating that "for a court to determine whether a plaintiff has a claim for a tort committed in violation of international law, it must decide whether there is an applicable norm of international law, whether it is recognized by the United States, and whether it is violated in the particular case").

Plaintiffs' FAC lists five different bases for their ATS claims: (1) extrajudicial killing and violation of the laws of wars, FAC at ¶¶ 43–48; (2) torture, *id.* at ¶¶ 49–56; (3) crimes against humanity, *id.* at ¶¶ 57–61; (4) cruel, inhuman, and degrading treatment, *id.* at ¶¶ 62–67; and (5) war crimes, *id.* at ¶¶ 68–72.

**a. Extrajudicial killing**

The United States, through the TVPA, has recognized that extrajudicial killing, no matter where it takes place, should be prohibited.[13] "Statutes of the United

*not* have to address the "practical consequences" of recognizing such claims. *See id.* at 12–13. The Court notes that some courts have agreed (at least implicitly) with Plaintiffs' interpretation of *Sosa. See Doe v. Liu Qi*, 349 F.Supp.2d 1258, 1320–28 (N.D.Cal.2004); *Saravia*, 348 F.Supp.2d at 1144. However, other courts have more closely followed the approach provided by the *Sosa* Court. *See In re Apartheid*, 346 F.Supp.2d at 553–54; *Jama v. United States Immigration and Naturalization Service*, 343 F.Supp.2d 338, 360–61 (D.N.J.2004).

While the Supreme Court did not expressly disavow the "specific, universal, and obligatory" standard, the Court chooses to closely follow the approach provided by *Sosa*.

**13.** The Court does not believe that the TVPA precludes claims of torture and extrajudicial killing under the ATS. *See* Reply at 18–19. The Court follows *Beanal* on this issue, 969 F.Supp. at 381, and declines to hold that the "TVPA repealed by implication the Alien Tort Statute, either in whole or in part." The legislative history indicates that Congress intended the TVPA to "*enhance* the remedy already available under section 1350 in an important respect: while the Alien Tort Claims

Act provides a remedy to aliens only, the TVPA would extend a civil remedy also to U.S. citizens who may have been tortured abroad." S.Rep. No. 102–249 at 5 (emphasis added). *See also* H.R.Rep. No. 102–367 at 4 (same). Consequently, the ATS "should remain intact." *Id. See Saravia*, 348 F.Supp.2d at 1145 (finding that the plaintiff could bring a claim for extrajudicial killing under both the TVPA and ATCA because "the enactment of the TVPA did not diminish the scope of the ATCA in any way"); *Wiwa*, 2002 WL 319887 at *4 (finding that "the TVPA did not preempt torture and summary execution claims under the ATCA"). *See also Rodriguez v. United States*, 480 U.S. 522, 524, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987) ("It is well settled . . . that repeals by implication are not favored.").

The Court also does not believe that ATS claims must now be modeled after the TVPA to include an administrative exhaustion requirement. *See* Motion at 17–20. Nothing in *Sosa* indicates that the Supreme Court worked such a dramatic change to the ATS. For example, the Court considered an exhaustion requirement, a key part of the TVPA, but did not adopt it for the ATS. *See Sosa*, 124 S.Ct. at 2766 n. 21.

States, based on treaties or other forms of international law, provide a particularly useful source of international law for United States courts." *In re Agent Orange,* at 110. "They instance situations where the legislative and executive branches of government agree on what that international law is and agree that we are bound by it." *Id.See also Saravia,* 348 F.Supp.2d at 1154 ("Congress' enactment of the TVPA, singling out torture and extrajudicial killing, confirms that extrajudicial killing provides a cause of action under federal law."). *Cf. Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 392, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970) (observing that it is "the duty of the common-law court to perceive the impact of major legislative innovations and to interweave the new legislative policies with the inherited body of common-law principles").

 Thus, the Court holds that there is a binding customary international law norm against extrajudicial killing. *See Saravia,* 348 F.Supp.2d at 1153–54. *See also Doe I v. Unocal Corp.,* 395 F.3d 932, 945 (9th Cir.2002) (recognizing murder as a *jus cogens* violation and thus, as a violation of the law of nations); *In re Estate of Marcos Human Rights Litigation,* 25 F.3d 1467, 1475 (9th Cir.1994) ("*Estate II* ") (describing the "prohibition against summary execution" as a "similarly universal, definable, and obligatory" norm); *Xuncax v. Gramajo,* 886 F.Supp. 162, 184 (D.Mass. 1995) (finding summary execution to be a violation of international law).

### b. Torture

As with Plaintiffs' claims for extrajudicial killings, the Court holds that the existence of the TVPA is strong evidence that the prohibition against torture is a binding customary international law norm. *See In re Agent Orange,* at 110; *Saravia,* 348 F.Supp.2d at 1154.

 Thus, the Court holds that there is a customary international law norm against torture. *See also Doe I,* 395 F.3d at 945 (recognizing torture as a *jus cogens* violation and thus, as a violation of the law of nations); *Estate II,* 25 F.3d at 1475 (recognizing the right to be free from torture as a specific, universal, and obligatory international law norm); *Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 716 (9th Cir.1992) (stating that "[t]here is no doubt that the prohibition against official torture is a norm of customary international law"); *Filartiga v. Pena–Irala,* 630 F.2d 876, 884 (2d Cir. 1980) (concluding that "official torture is now prohibited by the law of nations").

### c. Crimes against humanity

On this claim, Plaintiffs' best evidence is the Nuremberg Charter's prohibitions against crimes against humanity. *See* Arriaza Decl. at ¶ 31.[14] The charter was ratified by the World War II Allied Forces in 1945 and served as the basis for prosecutions that occurred after the end of the war. *Id.* at ¶ 32. The international criminal tribunals for the former Yugoslavia and Rwanda also recognize crimes against humanity. *Id.* at ¶¶ 34–35, 37. Numerous federal courts have previously recognized that customary international law prohibits crimes against humanity. *Id.* at ¶ 40. *See Sarei,* 221 F.Supp.2d at 1150 ("It is well-settled that a party who commits a crime against humanity violates international law and may be held liable under the ATCA.").

---

**14.** In order to determine what is an international law norm, the Court may properly consider the opinion of experts in the field. *See Sosa,* 124 S.Ct. at 2766–67. For this purpose, Plaintiffs have submitted a declaration from Naomi Roht–Arriaza, a professor of international human rights and international environmental law at the University of California, Hastings College of Law.

■ The Court believes that it can rely on the Nuremberg trials and the more recent international criminal tribunals as sources of customary international law. *But see In re Apartheid,* 346 F.Supp.2d at 549–50 (finding that these tribunals are not binding sources of international law). In *Sosa,* the Supreme Court held that the U.N. Universal Declaration of Human Rights did not establish the existence of binding customary international law because the Declaration did "not of its own force impose obligations as a matter of international law." 124 S.Ct. at 2767. The *Sosa* Court also held that the U.N. International Covenant on Civil and Political Rights was not a source of binding international law because, even though it was ratified, it was done so "on the express understanding that it was not self-executing" and did not create any enforceable obligations. *Id.See also Flores,* 343 F.3d at 162 (holding that "[t]reaties, which are entitled 'conventions' or 'covenants,' are proper evidence of customary international law because, and insofar as, they create *legal obligations*") (emphasis in original).

The Nuremberg trials imposed enforceable obligations. *See Alperin v. Vatican Bank,* 410 F.3d 532, 559–60 (9th Cir.2005) ("Following World War II, the Executive Branch exercised its authority in a number of ways, including through the Nuremberg trials, which included prosecution for ... crimes against humanity, war crimes, and crimes against peace."). The Charter for the Nuremberg trials authorized prosecution of war crimes and crimes against humanity. Of the twenty-two defendants prosecuted in the "Major War Criminals" trial, twelve were sentenced to death, seven received prison sentences, and three were acquitted.[15] *See* Steven Fogelson, The Nuremberg Legacy: An Unfulfilled Promise, 63 S. Cal. L.Rev. 833, 858 (March 1990). War crimes and crimes against humanity were two of the charges brought against these defendants. *Id.* at 852. This type of severe punishment would suggest that the Nuremberg Charter did not merely express an "aspiration". *See Sosa,* 124 S.Ct. at 2769.

The more recently established international criminal tribunals have continued to enforce norms against crimes against humanity and war crimes. The international criminal tribunal for the former Yugoslavia has also been enforcing prohibitions against war crimes and crimes against humanity. Several of the defendants have received prison sentences. *See* "Overview of ICTY Cases", *at* http://www.un.org/ icty/ cases/fact sheets/listindex-e .htm. Likewise, the international criminal tribunal for Rwanda has brought several cases charging crimes against humanity and has imposed prison sentences. *See* "Completed Cases", *at* http://www.ictr.org/ ENGLISH/cases/ completed.htm.

Given that these tribunals have prosecuted and punished individuals for committing war crimes and crimes against humanity, the Court finds both of these claims to be binding international law norms. *See also Sosa,* 124 S.Ct. at 2783 (Breyer, J., concurring) (commenting that "universal jurisdiction" exists to prosecute claims of torture, genocide, crimes against humanity, and war crimes). These past and ongoing proceedings demonstrate that these are "enforceable obligations".

■ Thus, the Court holds that there is a customary international law norm against crimes against humanity. *See also Flores v. Southern Peru Copper Corp.,* 343 F.3d 140, 150 n. 18 (2d Cir.2003) ("Custom-

---

**15.** Twelve other trials were later held in Nuremberg. *See generally* Nuremberg Trials Project, *at* http://nuremberg. law.harvard.edu (providing access to materials relating to the Nuremberg Trials).

ary international law rules proscribing crimes against humanity, including genocide, and war crimes, have been enforceable against individuals since World War II.").

#### d. Cruel, inhuman, and degrading treatment

The international criminal tribunals for the former Yugoslavia and Rwanda recognize claims for cruel, inhuman, and degrading treatment. *Id.* at ¶ 62. Numerous federal courts have recognized that customary international law prohibits cruel, inhuman or degrading treatment. *Id.* at ¶ 66.

▆▆▆ Due to their enforcement in the international criminal tribunals, the Court holds that there is a customary international law norm against cruel, inhuman, and degrading treatment. *See Liu Qi,* 349 F.Supp.2d at 1325 (recognizing a claim of cruel, inhuman, and degrading treatment based on alleged sexual abuse); *Jama,* 343 F.Supp.2d at 361 ("The law of nations as evidenced in the various conventions, treaties, declarations and other sources cited by the Jama plaintiffs can be said to have reached a consensus that the inhumane treatment of a huge number of persons accused of no crime and held in confinement is a violation of the law of nations."). *But see Sarei,* 221 F.Supp.2d at 1162 n. 190 (concluding that "plaintiffs have not demonstrated that prohibitions against cruel, inhuman, and degrading treatment (other than torture) and gross violations of human rights constitute established norms of customary international law"); *Xuncax,* 886 F.Supp. at 186 (finding that "it is evident that the prohibition against [cruel, inhuman, and degrading treatment] poses more complex problems of definition than are presented by norms forbidding torture, summary execution, disappearance or arbitrary detention"); *Forti v. Suarez–Mason,* 694 F.Supp. 707, 711–12 (N.D.Cal.1988)

(holding that there is no cognizable claim for cruel, inhuman, and degrading treatment due to the lack of a precise definition).

#### e. War crimes

"After the Second World War, the law of war was codified in the four Geneva Conventions, which have been ratified by more than 180 nations, including the United States." *Kadic,* 70 F.3d at 242 (citation omitted). *See also Ex parte Quirin,* 317 U.S. 1, 27–28, 63 S.Ct. 1, 87 L.Ed. 3 (1942) ("From the very beginning of its history this Court has recognized and applied the law of war as including that part of the law of nations which prescribes, for the conduct of war, the status, rights and duties of enemy nations as well as of enemy individuals."). In 1996, Congress enacted the War Crimes Act, which defined "war crime" in reference to the Geneva Conventions as well as other international agreements. *See* 18 U.S.C. § 2441(c). The War Crimes Act provides severe penalties for commission of war crimes, including the death penalty. *See* § 2441(a).

▆▆▆ Based on the Geneva Conventions and their incorporation into the War Crimes Act of 1996, the Court holds that there is a customary international law norm against attacks against civilians as war crimes. *See In re Agent Orange,* at 112–13. *See also Kadic,* 70 F.3d at 242–43 (recognizing an ATCA claim for war crimes); *Sarei,* 221 F.Supp.2d at 1139–40 ("Courts have held that a violation of the law of war may serve as a basis for a claim under the ATCA.").

#### 3. Practical consequences of making these causes of action available to litigants in the federal courts

Defendant argues that practical consequences should weigh against finding that these norms are sufficiently definite. *See*

Motion at 14–15, 16–17. Plaintiffs have not addressed this point due to their incorrect interpretation of *Sosa.*

In *Sosa*, the Court considered respondent's claim and observed that the implications of recognizing a cause of action for arbitrary detention "would be breathtaking." [16] 124 S.Ct. at 2768. On this point, the Court stated that:

> [Respondent's] rule would support a cause of action in federal court for any arrest, anywhere in the world, unauthorized by the law of the jurisdiction in which it took place, and would create a cause of action for any seizure of an alien in violation of the Fourth Amendment, supplanting the actions under Rev. Stat. § 1979, 42 U.S.C. § 1983 and *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), that now provide damages remedies for such violations.

*Id.* This portion of *Sosa* exhibits two distinct concerns: (1) the extent to which recognizing an ATS claim would allow foreign plaintiffs to pursue claims in U.S. courts; and (2) the extent to which recognizing an ATS claim would unnecessarily duplicate remedies provided through other federal laws. In *Sosa*, the plaintiff's ATS theory was both too broad and duplicative. However, in this case, not all of Plaintiffs' claims suffer from the same defects as the arbitrary detention claim brought by the plaintiff in *Sosa.* For the purpose of this analysis, "it is useful to examine [the plaintiff's] complaint in greater detail." *Id.* at 2767.

### a. Claims of extrajudicial killing and torture

In a previous step of its analysis, the existence of the TVPA convinced the Court that there are binding norms of international law for extrajudicial killing and torture. The existence of these statutes would indicate that these claims are not impermissibly broad because Congress has adopted statutes that define these concepts and assess liability for these actions. Legislative approval of punishment for these actions would suggest that the courts may—subject to other doctrines such as forum non conveniens—entertain these suits.

■ On the other hand, the existence of these statutes would also tend to indicate that recognizing these ATS claims unnecessarily duplicates existing federal causes of action. With respect to claims for extrajudicial killing and torture, this duplication should not lead to the conclusion that the practical consequences should bar Plaintiffs' claims. As discussed in footnote 13, the TVPA was intended to complement the ATS by allowing U.S. citizens, as well as aliens, to bring claims for extrajudicial killing and torture committed abroad. Given this legislative consideration, the Court does not believe that it should find ATS claims for extrajudicial killing and torture to be duplicative where Congress has concluded otherwise.

Thus, the Court does not dismiss Plaintiffs' ATS claims for extrajudicial killing and torture due to practical consequences.

**16.** In 1990, a federal grand jury had indicted the plaintiff, a Mexican national, for his involvement in the torture and murder of a Drug Enforcement Administration ("DEA") agent in Mexico. *Id.* at 2746. Due to difficulties in extricating the plaintiff from Mexico, the DEA hired a group of Mexican nationals to abduct. the plaintiff and transport him by private plane to the U.S. where he was arrested. *Id.* He stood trial for his alleged crimes and was acquitted. *Id.* After returning to Mexico, he instituted a civil action against several Mexican nationals and the DEA. *Id.* at 2747.

### b. Claims of crimes against humanity

 Plaintiffs' claims of crimes against humanity allege that the attack on Santo Domingo was part of "widespread and systematic" violence intended to result in the "forced displacement of civilians." *See* FAC at ¶ 58. In other cases, courts have restricted claims of crimes against humanity to more limited circumstances. *See Sarei*, 221 F.Supp.2d at 1150 (considering "crimes against humanity" as actions that "target a particular group of people for political, racial, or religious reasons"). Plaintiffs have not alleged that Defendant targeted them due to their membership in a particular group but "in furtherance of the organizational policy of securing Defendant Occidental's pipeline." *See* FAC at ¶ 58. Unlike *Sosa*, the Court finds that this type of claim is not impermissibly broad. The Court imagines, perhaps optimistically, that the violent displacement of persons does not occur as often as "arbitrary detention." In addition, the Court is unaware of any other causes of action that this type of claim would supplant.

Since there are no practical consequences that should limit the availability of this claim under the ATS, the Court does not dismiss Plaintiffs' ATS claims for crimes against humanity.

### c. Claims of cruel, inhuman, and degrading treatment

 Plaintiffs' claims of cruel, inhuman, and degrading treatment allege that Defendant's acts resulted in gross humiliation, fear, and anguish. *See* FAC at ¶ 63. These actions caused Plaintiffs to fear for their lives and forced them to flee their homes. *Id.* at ¶ 64. It would be impractical to recognize these allegations as constituting an ATS claim because it would allow foreign plaintiffs to litigate claims in U.S. courts that bear a strong resemblance to intentional infliction of emotional distress. While the Court has held that there is an international norm against cruel, inhuman,

and degrading treatment, the broad swaths of conduct that could result in extreme fear and anguish counsel against recognizing such a claim. However, this should be taken to indicate that claims of cruel, inhuman, and degrading treatment should not be recognized when they arise out of more severe situations such as those involving sexual abuse, *see Liu Qi*, 349 F.Supp.2d at 1325.

Thus, the Court dismisses Plaintiffs' ATS claims for cruel, inhuman, and degrading treatment.

### d. Claims of war crimes

Plaintiffs' claims of war crimes allege that "Colombia has been in a state of war" and that Defendant targeted civilians as a part of military operations. *See* FAC at ¶¶ 69–70. The Court does not find that these claims are too broad. These war crimes claims are sufficiently severe that they should be recognized by the federal courts.

 The existing federal cause of action for war crimes does not render an ATS claims for war crimes impermissibly duplicative. The War Crimes Act is a criminal statute. *See* 18 U.S.C. § 2441; *In re Agent Orange*, at 112. Since recognizing an ATS claim for war crimes would only provide for civil liability, there is no duplication that would make it impracticable for such a cause of action to exist.

### 3. Summary

In summary, the Court GRANTS Defendant's motion to dismiss the claims for cruel, inhuman, and degrading treatment but DENIES Defendant's motion to dismiss Plaintiffs' other ATS claims.

### C. Plaintiffs' state law claims

In addition to their federal claims, Plaintiffs have alleged state law claims of wrongful death, intentional infliction of

emotional distress, negligent infliction of emotional distress, and violations of Cal. Bus. & Prof.Code § 17200. FAC at ¶¶ 73–94.

### 1. Statute of limitations

Defendant argues that Plaintiffs' state law claims should be dismissed because they are time-barred. *See* Reply at 24 n. 24. Plaintiffs filed their original complaint on April 24, 2003.

█ A claim cannot be dismissed as time-barred "unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1207 (9th Cir.1995).

█ "In a federal question action where the federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state—in this case, California." *Paracor Finance, Inc. v. General Electric Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir.1996). "Where the conflict [of laws] concerns a statute of limitations, the governmental interest approach generally leads to California courts to apply California law ... and especially so where California's statute would bar a claim." *See Deutsch v. Turner Corp.*, 324 F.3d 692, 716–17 (9th Cir.2003) (citations omitted). Since the Court is exercising supplemental jurisdiction over Plaintiffs' state law claims, the Court turns to California state law regarding statutes of limitation.

### a. Accrual of the cause of action

█ "An action ordinarily accrues on the date of injury." *Ward v. Westinghouse Canada, Inc.*, 32 F.3d 1405, 1407 (9th Cir.1994) (citing *Jolly v. Eli Lilly &*

*Co.*, 44 Cal.3d 1103, 245 Cal.Rptr. 658, 751 P.2d 923 (Cal.1988)). However, "under the delayed discovery rule, the statute begins to run when a reasonable person in the plaintiff's position is on 'inquiry notice' of 'potential wrongdoing.'"[17] *Id.* "Under California law, knowledge of an injury and its cause does not necessarily imply that any wrongdoing has occurred or that anyone is to blame." *Id.* Further, "ignorance of the identity of the defendant does not affect the statute of limitations." *Jolly*, 44 Cal.3d at 1114, 245 Cal.Rptr. 658, 751 P.2d 923. Whether a plaintiff is on "inquiry notice" of "potential wrongdoing" is a question of fact. 32 F.3d at 1408. *See also Clark v. Baxter Healthcare Corp.*, 83 Cal.App.4th 1048, 1057, 100 Cal.Rptr.2d 223 (Cal.Ct.App.2000) (interpreting *Jolly* as holding that "the plaintiff must be aware of her injury, its factual cause, and sufficient facts to put her on inquiry notice of a negligent cause").

In the instant case, Plaintiffs have brought claims "as a result of their hometown of Santo Domingo and the resulting violent deaths of their family members." FAC at ¶ 1. That bombing allegedly occurred on December 13, 1998. *Id.* at ¶ 2. *See also* ¶¶ 19–24, 27–29 (describing the bombing, and events taking place shortly thereafter, in more detail). Thus, from the FAC, it appears that Plaintiffs' injuries occurred on December 13, 1998 or shortly thereafter.

█ According to the complaint, around December 14th, Plaintiff Luis Alberto Galvis "joined a human rights organization, the Joel Sierra Organization, and began to publicly denounce the massacre at Santo Domingo." FAC at ¶ 28. The Court believes that this allegation indicates that Plaintiff Luis Alberto Galvis had

**17.** The Court notes that the delayed discovery rule does not apply to § 17200 claims. *See Snapp & Associates Ins. Services, Inc. v. Rob-* *ertson*, 96 Cal.App.4th 884, 891, 117 Cal. Rptr.2d 331 (2002).

"inquiry notice" of "wrongdoing" at this time. That Plaintiff Luis Alberto Galvis may not have not known that Defendant was involved is immaterial, *see Jolly*, 44 Cal.3d at 1114, 245 Cal.Rptr. 658, 751 P.2d 923; he knew that there was some "wrongdoing" on December 14, 1998.

■ While one would imagine that an unprovoked bombing of one's home would immediately conjure up beliefs about "wrongdoing," the FAC does not allege facts relating the other Plaintiffs' reactions, public or otherwise, regarding the bombing in Santo Domingo. Even though it is difficult to conclude that any "reasonable person" would have had such a belief, the Court cannot conclude that these Plaintiffs could prove no set of facts showing that they were not placed on "inquiry notice" of wrongdoing. Thus, with respect to Plaintiffs Mario Galvis Galvez and John Mario Galvis, the Court is unable to make a finding as to when their tort claims accrued.

#### b. Applicable statutes of limitations

In 1998, Cal.Civ.Proc.Code § 340(3) provided a one-year statute of limitations for personal injury and wrongful death actions. *See* 3 Witkin, Cal. Proc. 4th, Actions § 517, 649–50 (1996); *see also Ward*, 32 F.3d at 1407. In 2002, this provision was amended by Cal. Civ. Proc. § 335.1 so that there is now a two-year statute of limitations for personal injury and wrongful death actions. With the exception of 9/11 terrorism victims, the extended statute of limitations only applies prospectively. *See Krupnick v. Duke Energy Morro Bay, L.L.C.*, 115 Cal.App.4th 1026, 1028–29, 9 Cal.Rptr.3d 767 (2004). Thus, the previous one-year statute of limitations applies to Plaintiff Luis Alberto Galvis' claims. Since his claim accrued, at the latest, sometime towards the end of 1998, the statute of limitations on his wrongful death, intentional infliction of emotional distress, and negligent infliction of emotional distress claims expired at the end of 1999. Thus, the Court dismisses Plaintiff Luis Alberto Galvis' tort claims as time-barred.

The statute of limitations for § 17200 claims is four years. *See* Cal. Bus. & Prof.Code § 17208. The statute of limitations on these claims expired in December 2002. Thus, the Court dismisses all of Plaintiffs' § 17200 claims as time-barred.

Taking Defendant's statute of limitations arguments into account, the Court finds that Plaintiffs Mario Galvis Galvez and John Mario Galvis' tort claims should not be dismissed. Thus, the Court must address whether the foreign affairs doctrine bars these claims.

#### 2. Foreign affairs doctrine

Defendant cites *American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003), as support for the dismissal of Plaintiffs' state law claims pursuant to the foreign affairs doctrine. *See* Motion at 20–22. Plaintiffs argue that Defendant misinterprets that opinion. *See* Opposition at 23.

##### a. The *Garamendi* and *Zschernig* opinions

In *Garamendi*, the Supreme Court held that California's Holocaust Victim Insurance Relief Act of 1999 ("HVIRA") was preempted because it interfered with the federal government's exercise of its foreign relations power. 539 U.S. at 401, 123 S.Ct. 2374. The challenged state statute required any insurer doing business in the state of California to disclose the details of any and all insurance policies issued in Europe between 1920 and 1945. *Id.* at 409–10, 123 S.Ct. 2374. The details of the policies would then be made available to the public through a central registry. *Id.* at 410, 123 S.Ct. 2374. While California enacted this legislation (along with other

related statutes), the federal government was taking its own approach to Holocaust-related claims.

Around this time, President Clinton was negotiating directly with the German government on a coordinated approach to these claims and, in 2000, signed the German Foundation Agreement. *Id.* at 405, 123 S.Ct. 2374. The Foundation procedure, funded by the German government and various German companies, would attempt to provide compensation to all individuals that had suffered under the Nazi regime in Germany. *Id.* In exchange for establishing this compensation fund, the President agreed to attempt to shield Germany from further lawsuits by filing Statements of Interest in the courts, encouraging them to defer to the Foundation procedure. *Id.* at 405–06, 123 S.Ct. 2374. In addition, the Foundation, when addressing insurance claims, would also work with the International Commission on Holocaust Era Insurance Claims ("ICHEIC"). *Id.* at 406–07, 123 S.Ct. 2374. The ICHEIC negotiated with European insurers to provide information about World War II era insurance policies and established procedures for handling claims. *Id.* at 407, 123 S.Ct. 2374. Notably, the Foundation Agreement did not expressly preempt any state laws. *Id.* at 416–17, 123 S.Ct. 2374.

Since there was no express preemption, the Court then had to examine whether the California state statute was "preempted" under the foreign affairs doctrine. The petitioners challenging the California law relied on *Zschernig,* a case examining the foreign relations implications of an Oregon probate statute. *Id.* at 417, 123 S.Ct. 2374. *See also Deutsch,* 317 F.3d at 1021 (describing *Zschernig* as the only prior case in which the Supreme Court has struck down a state statute under the foreign affairs doctrine). The Oregon statute examined by *Zschernig* "prohibited inheri-

tance by a nonresident alien, absent showings that the foreign heir would take the property 'without confiscation' by his home country and that American citizens would enjoy reciprocal rights of inheritance there." 539 U.S. at 417, 123 S.Ct. 2374. In practice, the Oregon probate proceedings under this statute provided state judges with an outlet to "disparage" foreign governments and express, in many instances, their anti-communist views. *Id.*

In *Zschernig,* a majority of the Supreme Court struck down the statute due to these disparaging statements made by Oregon state judges. While recognizing that states "traditionally regulated the descent and distribution of estates", the majority believed that in practice, the Oregon probate statute "impair[ed] the effective exercise of the Nation's foreign policy." 389 U.S. at 440, 88 S.Ct. 664. In the majority's view, the statute had "a direct impact upon foreign relations" and had a potential to "adversely affect the power of the central government to deal with those problems." *Id.* at 441, 88 S.Ct. 664. In a separate concurring opinion, Justice Harlan (reacting to another concurring opinion filed by Justice Stewart) described earlier cases as establishing that "in the absence of a conflicting federal policy or violation of the express mandates of the Constitution the States may legislate in areas of their traditional competence even though their statutes may have an incidental effect on foreign relations." *Id.* at 458–59, 88 S.Ct. 664.

In *Garamendi,* the Court described the majority's and Justice Harlan's opinions as "contrasting theories of field and conflict preemption." 539 U.S. at 419, 123 S.Ct. 2374. However, in its further analysis, the Court did not decide which approach is correct. *Id.* at 419–20, 123 S.Ct. 2374. Instead, the Court held that "even on Justice Harlan's view", the challenged statute

would likely produce "something more than incidental effect in conflict with the express foreign policy of the National Government." *Id.* at 420, 123 S.Ct. 2374. The Court further hypothesized that, even if a state were legislating in an area of "traditional competence", "it would be reasonable to consider the strength of the state interest, judged by standards of traditional practice, when deciding how serious a conflict must be shown before declaring the state law preempted." *Id.*

In footnote 11 of the opinion, Justice Souter considered the possibility that the majority's and Justice Harlan's opinions could be taken as "complementary" rather than "contrasting" approaches. In this potential understanding of *Zschernig*, if a state were taking a foreign policy position by legislating outside an area of "traditional competence", "field preemption" may be appropriate. 539 U.S. at 420 n. 11, 123 S.Ct. 2374. Alternatively, if a state were legislating within an area of "traditional competence" in a way that affected foreign relations, "it might make good sense to require a conflict, of a clarity or substantiality that would vary with the strength or the traditional importance of the state concern asserted." *Id.* The Court notes that the *Garamendi* Court did not explicitly adopt this two-tiered approach in its opinion.

### b. Application of the Foreign Affairs doctrine to the instant state law claims

Plaintiffs' remaining claims are for wrongful death, intentional infliction of emotional distress, and negligent infliction of emotional distress.

As a threshold matter, the Court believes that these claims involve an area of "traditional competence" for state regulation—tort law. In this respect, the instant state law claims are different than the HVIRA, a law targeted specifically at the issue of Holocaust-related insurance policies. *See Garamendi,* 539 U.S. at 426, 123 S.Ct. 2374 (stating that there is "no serious doubt that the state interest actually underlying HVIRA is concern for the several thousand Holocaust survivors said to be living in the State"). Unlike the HVIRA, the California legislature could have hardly envisioned that these laws would have implicated any foreign policy concerns. Thus, the Court should "consider the strength of the state interest, judged by standards of traditional practice, when deciding how serious a conflict must be shown before declaring the state law preempted." *Id.* at 420, 123 S.Ct. 2374.

With respect to Plaintiffs' tort claims, the Court finds that California has a weak interest. California has a weak interest because Plaintiffs have never resided in this state. *Cf. Arno v. Club Med,* 22 F.3d 1464, 1468 (9th Cir.1994) (with respect to torts, California has an interest in providing compensation to its residents); *Kasel v. Remington Arms Co.,* 24 Cal.App.3d 711, 734, 101 Cal.Rptr. 314 (1972) ("Where the real issue in a case is compensation of the injured person, California courts have tended to apply the law of the place of the injured's domicile, finding that that state has the greatest interest in compensating its domiciliaries."). Plaintiffs previously resided in Colombia and now live in Canada. With respect to Plaintiffs' wrongful death claims, California also has a weak interest since the tortious conduct did not take place in California and Defendant is a resident of this state. *Cf. Browne v. McDonnell Douglas Corp.,* 504 F.Supp. 514, 517 (N.D.Cal.1980) (for wrongful death actions, "the state is concerned with tortious conduct within its borders, with compensation for local plaintiffs, and with the limitation of damages payable by resident defendants"). Since California has a weak interest in Plaintiffs' claims, there does not have to be a strong conflict to

preempt their claims. *See Garamendi,* 539 U.S. at 420, 123 S.Ct. 2374.

■ The Court finds that the "more than incidental" strength of the instant conflict with foreign policy is sufficient to overcome the weak state interest of Plaintiffs' claims. As explained in the U.S. State Department's Supplemental Statement of Interest, allowing Plaintiffs to pursue these state law claims would interfere with several of its foreign policy goals[18]:

An important part of our foreign policy is to encourage other countries to establish responsible legal mechanisms for addressing and resolving alleged human rights abuses. Duplicative proceedings in U.S. courts second-guessing the actions of the Colombian government and its military officials and the findings of Colombian courts, and which have at least the potential for reaching disparate conclusions, may be seen as unwarranted and intrusive to the Colombian government. Moreover, it may also be perceived that the U.S. Government does not recognize the legitimacy of Colombian judicial institutions. These perceptions could potentially have negative consequences for our bilateral relationship with the Colombian government. Colombia is one of the United States' closest allies in this hemisphere, and our partner in the vital struggles against terrorism and narcotics trafficking.... Colombia's role in helping to maintain

Andean regional security, our trade relationship, and our national interest in the security of U.S. persons and U.S. investments in Colombia, rank high on our foreign policy agenda....

Lawsuits such as the one before Judge Rea have the potential for deterring present and future U.S. investment in Colombia.... Finally, reduced U.S. investment in Colombia's oil industry may detract from the vital U.S. policy goal of expanding and diversifying our sources of imported oil....

*See* Supplemental Statement of Interest of the United States, filed December 30, 2004 at 2.

Since these strong federal foreign policy interests outweigh the weak state interests involved, the Court dismisses Plaintiffs' state law claims pursuant to the foreign affairs doctrine.

### D. Act of state doctrine

Since the Court has dismissed Plaintiffs' TVPA and state law claims, Plaintiffs' sole remaining causes of action are their ATS claims. Thus, the Court examines whether the act of state doctrine would bar the Court's adjudication of these claims.

Defendant argues that the act of state doctrine bars the instant case because courts may not judge "the validity of a foreign sovereign's official act within its own territory." *See* Motion at 22–23.

---

18. The Court notes that it must take these statements regarding foreign policy at face value. *See Sarei,* 221 F.Supp.2d at 1181–82 (holding that "the court must accept the statement of foreign policy provided by the executive branch as conclusive of its view of that subject; it may not assess whether the policy articulated is wise or unwise, or whether it is based on misinformation or faulty reasoning"); *cf. Sosa,* 124 S.Ct. at 2766 n. 21 (noting that "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's

impact on foreign policy"); *Republic of Austria v. Altmann,* 541 U.S. 677, 124 S.Ct. 2240, 2255, 159 L.Ed.2d 1 (2004) (with respect to foreign sovereign immunity, stating that "should the State Department choose to express its opinion on the implications of exercising jurisdiction over *particular* petitioners in connection with *their* alleged conduct, that opinion might well be entitled deference as the considered judgment of the Executive on a particular question of foreign policy") (emphases in original).

Plaintiffs argue that there is no "act of state" and, alternatively, that the *Sabbatino* factors indicate that the act of state doctrine should not apply. *See* Opposition at 21–22.

■ "When applying the *Sabbatino* test, the party asserting the applicability of the act of state doctrine bears the burden of proof." *National Coalition Government of the Union of Burma v. Unocal, Inc.*, 176 F.R.D. 329, 350 (C.D.Cal.1997) (*"NCGUB"*).

### 1. Whether the act of state doctrine applies to the instant case

Plaintiffs first argue that the act of state doctrine does not apply to the instant case because the CAF was acting "in the private, business interest of Occidental" rather than "pursuant to official Colombian policy." *See* Opposition at 21 n. 24.

While the true nature of the relationship between Defendants and the Colombian military may only be revealed through further proceedings, Plaintiffs have pled that the CAF was working as an extension of Defendant rather than as a segment of the Colombian government. *See* FAC at ¶ 2 ("The CAF receives direct funding from Defendant Occidental ... in return for protecting Occidental's pipeline in Caño Limon and was acting in the furtherance of the private interests of Occidental in carrying out this bombing."); *id.* at ¶ 19 ("On December 13, 1998, Defendant AirScan and the CAF, in their role as security contractors for Defendant Occidental, jointly participated in the raid upon Santo Domingo."); *id.* ("The CAF, in carrying out this raid, was acting in its role of providing security for Occidental and was not implementing official policy of the Colombian government."); *id.* at ¶ 25 ("While the stated purpose of the raid was to protect Defendant Occidental's pipeline from sabotage by left-wing insurgents ...").

■ "Act of state issues only arise when a court *must decide*—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign." *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., Intern.*, 493 U.S. 400, 406, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990) (emphasis in original). When the Court must address such issues, the act of state doctrine can be invoked by private entities. *See Doe I*, 395 F.3d at 958; *see also Sarei*, 221 F.Supp.2d at 1184 ("The act of state doctrine comes into play only when the outcome of a case turns on the effect of official action by a foreign sovereign.").

In addition, Defendant argues that military actions are quintessential official acts. *See* Defendant's Supp. Memo. at 5 (citing *Roe v. Unocal Corp.*, 70 F.Supp.2d 1073, 1079 (C.D.Cal.1999)). *See also Sarei*, 221 F.Supp.2d at 1188 ("Orders given by military commanders during wartime are commonly viewed as official sovereign acts.").[19] Despite Plaintiffs' allegations[20], the Court

---

**19.** However, the Court notes that courts have found that military acts that constitute "illegitimate warfare" are not "official" acts of state. *See Sarei*, 221 F.Supp.2d at 1189. With respect to this approach, the Court believes that applying the *Sabbatino* factors will lead largely to the same result as finding that the challenged actions are not "official". The Court expects that, in many cases, the "public interest" factor put forth in *Liu* will overlap with the legitimacy inquiry.

**20.** The Court realizes that, for purposes of the instant motion, it must take Plaintiffs' allegations as true. While the Court could defer ruling on this issue, it also believes that it will inevitably have to address the act of state doctrine. As the act of state doctrine "reflects a concern that judicial determinations regarding the conduct of a foreign nation not interfere with executive branch foreign policy decisions", *see Sarei*, 221 F.Supp.2d at 1184, the Court thinks it more prudent to address this doctrine earlier than later.

believes the instant case involves official acts because "the governmental action here could not have been taken by a private citizen." *See Clayco Petroleum Corp. v. Occidental Petroleum Corp.*, 712 F.2d 404, 408 (9th Cir.1983). Private citizens do not generally have the ability to maintain an air force and authorize the use of military force.

While the CAF is not a party to the instant case, the Court believes that it would inevitably address the involvement of the Colombian military in this case. Thus, the Court considers whether the act of state doctrine should bar Plaintiffs' claims.

### 2. The *Sabbatino* factors

In *Sabbatino*, the Supreme Court set out three factors that should be considered in applying the act of state doctrine:

(1) "the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it";

(2) "the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches"; and

(3) whether "the government which perpetrated the challenged act of state is no longer in existence."

376 U.S. at 427–28, 84 S.Ct. 923.

In addition to these three factors, the Ninth Circuit has added a fourth consideration: "One factor we must consider is whether the foreign state was acting in the public interest." *Liu*, 892 F.2d at 1432. *See also Doe I*, 395 F.3d at 959 (same); *Liu Qi*, 349 F.Supp.2d at 1295 (same).

### a. The degree of codification or consensus

As cognizable ATS claims are based on binding international law norms, they necessarily involve claims where there is a great deal of international consensus. *See*

*Doe I*, 395 F.3d at 959 (noting that "[b]ecause *jus cogens* violations are, by definition, internationally denounced, there is a high degree of international consensus against them"); *Liu Qi* at 1296 (same); *see also Kadic*, 70 F.3d at 250 (noting that "it would be a rare case in which the act of state doctrine precluded suit under section 1350").

Thus, the first factor weighs against applying the act of state doctrine.

### b. The foreign relations implications

As described in the Court's discussion regarding the foreign affairs doctrine, several important foreign policy interests would potentially be implicated in the instant case. To the excerpt above, the Court would only add that Colombia has also indicated that it does not wish this case to proceed. *See* Supp. Statement of Interest, Attachment 2 (Letter from Colombian Ministry of Foreign Affairs, dated March 12, 2004).

Thus, the second factor weighs in favor of applying the act of state doctrine.

### c. Whether there has been a change in government

Plaintiffs argue that there has been a change in government since 1998. The current President of Colombia, Alvaro Uribe, took office in 2002. *See* Opposition at 22. Defendant argues that there has not been an actual "change of government" since the election of a new president is an insufficiently drastic change. *See* Reply at 25 n. 25; *see also* Morales Supp. Decl. (Corrected), Ex. A at 12 (explaining the election of presidents in Colombia).

As Plaintiffs argue, *see* Plaintiffs' Supp. Brief at 20 n. 17, if there has been a change in government, "the danger of interference with the Executive's conduct of foreign policy" may be lessened. *See Republic of Philippines v. Marcos*, 806 F.2d 344, 359 (2d Cir.1986). However, that is

not the case here. Even though there is a new President (and the possibility of a new approach to foreign policy), that is not the reality of the current situation. As mentioned previously, the *current* government of Colombia opposes further proceedings with this case.

Thus, even though there has been a change in government, this does not weigh against applying the act of state doctrine.

### d. Whether the Colombia was acting in the public interest

Since the alleged actions of Defendant violated binding international law norms, the Court cannot conclude Colombia was acting pursuant to the public interest. *See Doe I,* 395 F.3d at 960 (holding that "it would be difficult to contend" that violations of international human rights are in the "public interest"); *Liu Qi,* 349 F.Supp.2d at 1306 (same); *NCGUB,* 176 F.R.D. at 354 (same).

 Weighing these factors, the Court holds that the act of state doctrine does not apply to the instant case. While the second factor weighs in favor the application of the doctrine, the first and fourth weigh against such a finding. The third factor, for the reasons discussed, is not an important element of the Court's decision.

### E. Political question doctrine

Defendant argues that this case presents a nonjusticiable political question because (1) it touches on a matter of foreign relations; and (2) it would involve military decisions which the court does not have the standards to evaluate. *See* Motion at 24–25; Reply at 25. While these are reasonable grounds on which to argue that the political question doctrine should apply, the Court will focus on the Supplemental Statement of Interest filed by the U.S. State Department.

In the recent *Alperin* opinion, the Ninth Circuit thoroughly discussed the political question doctrine. Because of its analytical depth, the Court closely follows this opinion. In *Alperin,* 410 F.3d 532, 538–38, the plaintiffs brought claims against the Vatican Bank, the Order of Friars Minor, and the Croatian Liberation Movement for allegedly handling profits generated by the Croatian Ustasha political regime during World War II. The Ustasha regime was supported by Nazi Germany and accumulated its assets through looting and slave labor. *Id.* As categorized by the Ninth Circuit, the *Alperin* plaintiffs brought both property-related claims (conversion, unjust enrichment, restitution, and an accounting) and war-related claims (human rights claims and violations of international law). *Id.* at 542–44, 547–48. After examining all of the *Baker* factors, the Ninth Circuit held that the political question doctrine barred only the war-related claims thus allowing the property claims to proceed. *Id.* at 562.

At the outset, the Court observes that *Alperin* warned against "jumping to the conclusion" that all cases that touch on foreign relations and potentially controversial political issues are barred by the political question doctrine. *Id.* at 537–38. As is often noted, this doctrine is one of "political questions" not "political cases" and should be applied on a case-by-case basis. *Id.* Of the six *Baker* factors, the Court believes that the first, second, fourth, and sixth are especially pressing in the instant case.[21] The Court recognizes that only one factor needs to apply to render this case nonjusticiable. *See id.* at 544–45

---

**21.** The Court finds the third *Baker* factor, an initial policy determination unsuitable for the judiciary, to be inapplicable. *See id.* at 555–56. As discussed below with respect to the fourth and fifth factors, there has already been a policy determination by the Executive regarding the Santo Domingo bombing.

("Dismissal on the basis of the political question doctrine is appropriate only if one of [the *Baker* ] formulations is 'inextricable' from the case."). Further, the Court notes that the *Baker* factors are listed in *descending* order of importance and certainty. *See id.* at 545.

### 1. Textually demonstrable commitment

██ As noted by *Alperin, id.* at 548–49, there is no explicit, textually demonstrable commitment of foreign policy to the political branches of the United States. *See also Garamendi*, 539 U.S. at 414, 123 S.Ct. 2374 (noting that "the source of the President's power to act in foreign affairs does not enjoy any textual detail"). However, the Court recognizes that "the management of foreign affairs predominantly falls within the sphere of the political branches and the courts consistently defer to those branches." *Alperin*, 410 F.3d 532, 548–49. Despite the existence of this general presumption, even on matters involving foreign policy, "whether a court should defer to the political branches is a case-by-case inquiry because 'it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.'" *Id.* (quoting *Baker*, 369 U.S. at 211, 82 S.Ct. 691).

Initially, the Ninth Circuit held that there was no textual commitment because there was no relevant treaty or executive agreement addressing the specific reparations claim before the court. *Id.* at 549. Likewise, in the instant case, there is no treaty or executive agreement regarding the Santo Domingo bombing.

However, it seems that the more important analysis is based on the type of claims presented to the court. While all of the plaintiffs' claims would undoubtedly have had some international implications, the court framed plaintiffs' property-related claims as "simply seek[ing] restitution for looted assets belonging to purported class members," thus not implicating a political question. *Id.* at 549–52. Deciding whether an entity "is wrongfully holding assets" is "exactly what courts do." *Id.* at 549–52.

In contrast, *Alperin* held that the war-related claims were non-justiciable because the court would have had to intrude on foreign policy choices committed to the political branches by re-examining the Ustasha regime. *Id.* at 559–61. At first glance, this holding would seem to support application of the political question doctrine since this case would involve an examination of the CAF's actions. However, the Ninth Circuit distinguished the *Alperin* plaintiffs' claims from the Second Circuit's decision in *Kadic*[22] in the following manner:

> ... the claims in *Kadic* focused on the acts of a single individual during a localized conflict rather than asking the court to undertake the complex calculus of assigning fault for actions taken by a foreign regime during the morass of a world war.

*Id.* at 562. With respect to the instant case, the Court finds that Plaintiff's allegations are more similar to *Kadic* than the war-related claims brought in *Alperin*. While not involving a single individual, this dispute arises from a single incident—the bombing of Santo Domingo—instead of a more wide-ranging examination of a foreign regime's wartime actions. Further adjudication by this Court would more closely resemble a "tort suit," *see id.* at 562, than a "war crimes tribunal," *see id.* at 559–60.

---

22. "In *Kadic,* Croats and Muslims brought suit against Radovan Karadzic under the ATS alleging that he oversaw the genocidal campaign conducted by Bosnian–Serb military forces." *Id.* at 562.

Therefore, the Court finds that the first *Baker* factor does not support applying the political question doctrine.

### 2. Judicially discoverable and manageable standards

■■■ "The crux of this inquiry is ... not whether the case is unmanageable in the sense of being large, complicated, or otherwise difficult to tackle from a logistical standpoint." *Id.* at 552–53. "Rather, courts must ask whether they have the legal tools to reach a ruling that is 'principled, rational, and based upon reasoned distinctions.'" *Id.* (quoting *Vieth v. Jubelirer,* 541 U.S. 267, 278, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004)).

In *Alperin,* the Ninth Circuit held that this *Baker* factor did not apply because the plaintiffs' property-related claims rested on "federal statutes, common law, state law, and well-established case law" that "provide concrete legal bases for courts to reach a reasoned decision." *Id.* at 553–54. In the instant case, Plaintiffs' remaining claims rest on the ATS. While there is not yet "well-established" case law on several aspects of this federal statute, the Court cannot conclude that there are not "judicially discoverable and manageable standards" for this type of claim. After all, in *Sosa,* the Supreme Court recently concluded that the ATS provided a substantive cause of action and set out the framework discussed above for discerning cognizable theories under that statute. *See also Japan Whaling Ass'n v. American Cetacean Soc.,* 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) (stating that "it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts").

While Defendant argues that this Court does not have the appropriate "legal tools" to evaluate military action, it misconstrues Plaintiffs' claims as challenging the actions of the CAF instead of as an attempt to enforce binding international law norms. Thus, the Court finds that second *Baker* factor does not support applying the political question doctrine.

### 3. Lack of respect for coordinate branches

The fourth *Baker* factor requires the Court to consider whether it would be possible to resolve this case without expressing a lack of respect for the Executive's handling of foreign relations. *See id.* at 555–56. In *Alperin,* the Ninth Circuit held that its case did not run such a risk largely because the State Department did not attempt to intervene in the matter despite the urging of the Vatican. *Id.* The court noted that "[s]uch case-specific intervention is not uncommon in cases involving foreign affairs" and cited Judge Morrow's opinion in *Sarei* with approval. *Id.* at 556.

In *Sarei,* the court dismissed plaintiffs' case on political question grounds. 221 F.Supp.2d at 1195–99. In that case, the State Department filed a Statement of Interest indicating that allowing the plaintiffs to proceed with their case would interfere with the efforts of the Papua New Guinea and American governments to reach a peaceful end to the conflict giving rise to the suit.[23] *Id.* at 1196. The court concluded that allowing the case to proceed, in the face of such a Statement of Interest, would implicate the fourth and sixth *Baker* factors. *Id.* at 1196–98. *See also In re Nazi Era Cases Against German Defendants Litigation,* 129 F.Supp.2d

---

**23.** *See generally* Brian C. Free, Awaiting *Doe v. Exxon Mobil Corp.:* Advocating the Cautious Use of Executive Opinions in Alien Tort Claims Act Litigation, 12 Pac. Rim L. & Pol'y

467, 473–77 (March 2003) (discussing different administrations' use of statements of interest).

370, 382–84 (D.N.J.2001) (*"In re Nazi Era Cases"*) (finding that the same factors weighed in favor of yielding to the Foundation Agreement process); *but see In re Agent Orange*, at 1188 (finding the fourth *Baker* factor inapplicable because claims were based on international law).

In the instant case, the State Department has filed a Statement of Interest outlining several areas of foreign policy that would be negatively impacted by proceeding with the instant case. In addition, as outlined in that letter, the State Department has expressed its view that this litigation would interfere with its approach to encouraging the protection of human rights in Colombia. Notably, the State Department apparently agrees with Plaintiffs that a wrong has occurred: "On January 3, 2003, the U.S. Embassy in Bogotá informed the Colombian government of the U.S. decision to suspend assistance to CA-COM–1, the Colombian Air Force unit involved in the Santo Domingo incident." *See* Supp. Statement of Interest at 1–2.

However, the fourth *Baker* factor applies to the instant case because proceeding with the litigation would indicate a "lack of respect" for the Executive's preferred approach of handling the Santo Domingo bombing and relations with Colombia in general. In reaching this conclusion, the Court pays particular attention to the fact that this case involves foreign relations, an area over which the Executive has a great deal of responsibility. *See Garamendi*, 539 U.S. at 414, 123 S.Ct. 2374 ("Although the source of the Presi-

dent's power to act in foreign affairs does not enjoy any textual detail, the historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations.'") (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring)). *Cf. Sosa*, 124 S.Ct. at 2766 n. 21 (noting that "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy"). Were the Executive to file a statement of interest regarding an issue that did not involve foreign policy [24], it would deserve less weight.

For the above reasons, the Court finds that the fourth *Baker* factor supports applying the political question doctrine.[25]

### 4. Potentiality of embarrassment from multifarious pronouncements

In *Alperin*, the Ninth Circuit held that this factor did not apply because its suit was the "only game in town" and that the Executive had not been involved in any "negotiations, agreements, or settlements" regarding the matters before the court. 410 F.3d 532, 558. As with the fourth factor, the court noted that the State Department had not yet filed a statement of interest in the case. *Id. See also Sarei*, 221 F.Supp.2d at 1196–98 (applying the sixth

---

24. The Court notes that this case may not present a "pure issue" of foreign policy as Defendant is an American corporation located in Los Angeles (less than twelve miles from this courthouse). There may be a substantial degree to which the alleged actions of an American corporation abroad is a domestic concern as well.

25. For similar reasons, the fifth *Baker* factor, adherence to a policy decision, would also render the instant case non-justiciable. Unlike *Alperin*, the Executive has indicated that it wishes to pursue non-judicial methods of remedying the wrongs committed in Santo Domingo. Further adjudication of this case would constitute disagreement with this prior foreign policy decision. 410 F.3d 532, 557–58.

*Baker* factor due, in part, to the filing of a statement of interest).

Unlike *Sarei,* the Court finds that the instant case does not implicate the sixth *Baker* factor. *See also In re Agent Orange,* at 72 (holding that the sixth *Baker* factor did not apply because "[i]t raises issues that courts are structured and empowered to decide—the nature and applicability of substantive international law and domestic tort law"). While the State Department has made it clear it does not wish this case to proceed, the Executive has not conducted any negotiations or settlement on behalf of individuals like Plaintiffs, that were injured by the Santo Domingo bombing. For all intents and purposes, this suit is the "only game in town" for Plaintiffs.

In *In re Nazi Era Cases,* the district court held that the sixth *Baker* factor was implicated because allowing the case to proceed would counter an executive agreement signed by the President and "the pronouncement by our government that claims against German Industry should not be litigated, but instead should be submitted to the Foundation." 129 F.Supp.2d at 383. In its further discussion, the district court considered the reliance placed on that executive agreement by the German government, German companies, and victims of the Holocaust that had previously consented to the dismissal of their cases. *Id.* The court believed that allowing the suit to go forward would have undermined both the "political branches in the realm of foreign affairs" and "the Foundation itself" resulting in the "distrust" of the German people for the United States and the President. *Id.*

The Court believes that proceeding with the instant case would not similarly erode the standing of the President. With respect to the bombing in Santo Domingo, the Executive did not get involved in direct, high-level negotiations with the Co-lombian government to negotiate an executive agreement. The Court is unaware of any individuals or entities that have relied on the Executive's promises or statements. The Court is also unable to conclude that the people of Colombia would lose any respect for the United States if this Court allowed Colombians to obtain a remedy from an American corporation for a wrong that was allegedly committed in their country. To the extent that the instant case would involve the examination of the actions of the Colombian military, the United States has already expressed disapproval of the CAF's actions by ending military assistance to the unit involved in the bombing.

Thus, the Court finds that the sixth *Baker* factor does not support applying the political question doctrine.

**5. Summary**

■ In summary, after surveying all of the *Baker* factors, the Court finds that two—lack of respect for coordinate branches and adherence to a policy decision—apply. Thus, the Court dismisses the instant action as raising a non-justiciable political question.

**CONCLUSION**

For the foregoing reasons, the Court DENIES, in part, and GRANTS, in part, Defendant's Motion to Dismiss Plaintiffs' First Amended Complaint Pursuant to Fed.R.Civ.P. 12(b)(6).

IT IS SO ORDERED.